## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## EASTERN DIVISION

No. 4:15-CV-27-FL

| | |
|---|---|
| BETTY ANN TANNER, | ) |
| | ) |
| Plaintiff/Claimant, | ) |
| | ) |
| | ) **MEMORANDUM AND** |
| v. | ) **RECOMMENDATION** |
| | ) |
| CAROLYN W. COLVIN, Acting | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

This matter is before the court on the parties' cross-motions for judgment on the pleadings [DE-14, DE-16] pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. Claimant Betty Ann Tanner ("Claimant") filed this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking judicial review of the denial of her application for supplemental security income ("SSI"). The time for filing responsive briefs has expired and the pending motions are ripe for adjudication. Having carefully reviewed the administrative record and the motions and memoranda submitted by the parties, it is recommended that Claimant's Motion for Judgment on the Pleadings be allowed, Defendant's Motion for Judgment on the Pleadings be denied, and the case be remanded for further proceedings.

## I. STATEMENT OF THE CASE

Claimant protectively filed an application for SSI on May 12, 2011, alleging disability beginning March 15, 2005. (R. 15, 229-35). The claim was denied initially and upon reconsideration. (R. 74-104). A hearing before the Administrative Law Judge ("ALJ") was held on May 13, 2013, at which Claimant was represented by counsel and a vocational expert ("VE")

appeared and testified. (R. 34-73). On August 29, 2013, the ALJ issued a decision denying Claimant's request for benefits. (R. 12-33). Claimant requested a review of the ALJ's decision, and the Appeals Council denied Claimant's request for review on December 18, 2014. (R. 1-5). Claimant then filed a complaint in this court seeking review of the now-final administrative decision.

## II. STANDARD OF REVIEW

The scope of judicial review of a final agency decision regarding disability benefits under the Social Security Act ("Act"), 42 U.S.C. § 301 *et seq.*, is limited to determining whether substantial evidence supports the Commissioner's factual findings and whether the decision was reached through the application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). While substantial evidence is not a "large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988), it is "more than a mere scintilla . . . and somewhat less than a preponderance." *Laws*, 368 F.2d at 642. "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996), *superseded by regulation on other grounds*, 20 C.F.R. § 416.927(d)(2)). Rather, in conducting the "substantial evidence" inquiry, the court's review is limited to whether the ALJ analyzed the relevant evidence and sufficiently explained his or her findings and rationale in crediting the evidence. *Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Case 4:15-cv-00027-FL   Document 19   Filed 01/26/16   Page 2 of 30

## III. DISABILITY EVALUATION PROCESS

The disability determination is based on a five-step sequential evaluation process as set forth

in 20 C.F.R. § 416.920 under which the ALJ is to evaluate a claim:

The claimant (1) must not be engaged in "substantial gainful activity," i.e., currently working; and (2) must have a "severe" impairment that (3) meets or exceeds [in severity] the "listings" of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform . . . past work or (5) any other work.

*Albright v. Comm'r of the SSA*, 174 F.3d 473, 475 n.2 (4th Cir. 1999). "If an applicant's claim fails

at any step of the process, the ALJ need not advance to the subsequent steps." *Pass v. Chater*, 65

F.3d 1200, 1203 (4th Cir. 1995) (citation omitted). The burden of proof and production during the

first four steps of the inquiry rests on the claimant. *Id.* At the fifth step, the burden shifts to the ALJ

to show that other work exists in the national economy which the claimant can perform. *Id.*

When assessing the severity of mental impairments, the ALJ must do so in accordance with

the "special technique" described in 20 C.F.R. § 416.920a(b)-(c). This regulatory scheme identifies

four broad functional areas in which the ALJ rates the degree of functional limitation resulting from

a claimant's mental impairment(s): activities of daily living; social functioning; concentration,

persistence or pace; and episodes of decompensation. *Id.* § 416.920a(c)(3). The ALJ is required to

incorporate into his written decision pertinent findings and conclusions based on the "special

technique." *Id.* § 416.920a(e)(3).

In this case, Claimant alleges that the ALJ erred (1) in failing to consider whether to apply

a higher age category at step five; and (2) in assessing Claimant's credibility and determining

Claimant's residual functional capacity ("RFC"). Pl.'s Mem. [DE-15] at 10-27.

3

## IV. FACTUAL HISTORY

### A. ALJ's Findings

Applying the above-described sequential evaluation process, the ALJ found Claimant "not disabled" as defined in the Act. At step one, the ALJ found that Claimant had not engaged in substantial gainful employment since the application date. (R. 17). Next, the ALJ determined that Claimant had the severe impairments of degenerative disc disease of the lumbar spine, scoliosis, obesity, and an anxiety disorder. *Id.* At step three, the ALJ concluded Claimant's impairments were not severe enough, either individually or in combination, to meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 17-18). Applying the special technique prescribed by the regulations, the ALJ found that Claimant's mental impairments have resulted in moderate restrictions in her activities of daily living, social functioning, and concentration, persistence and pace, with no episodes of decompensation of extended duration. (R. 18-19).

Prior to proceeding to step four, the ALJ assessed Claimant's RFC, finding Claimant had the ability to perform light work[1] in a low stress, low production work environment with performance of only simple, routine, repetitive tasks with only occasional exposure to people. (R. 20-28). In making this assessment, the ALJ found Claimant's statements about her limitations not fully credible. (R. 22-24). At step four, the ALJ concluded that Claimant had no past relevant work. (R.

---

[1] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If an individual can perform light work, he or she can also perform sedentary work, unless there are additional limiting factors such as the loss of fine dexterity or the inability to sit for long periods of time. 20 C.F.R. § 416.967(b).

4

28). However, at step five, the ALJ concluded there were jobs that existed in significant numbers in the national economy that Claimant could perform. (R. 28-29).

## B.  Claimant's Testimony at the Administrative Hearing

Claimant was 54 years old and single at the time of the administrative hearing. (R. 37). She had been divorced for eight years and has three adult children. (R. 38). Claimant left school prior to completing ninth grade and attempted to obtain a GED but was unsuccessful. (R. 37-38). She last worked in 2005 as a cashier at Food Lion, but her employment was terminated after less than two weeks because she could not stand at the register for the long periods required, she could not see the keys on the register well enough to key in certain items, and she could not work at a satisfactory pace. (R. 39-40). Prior to working as a cashier, Claimant worked as a laundromat attendant for three months but left because she could not stand for the required eight hours due to back pain. (R. 40-41). She was a "stay-at-home mom" from 1976 to 2005. (R. 41). Sometime after 2005, Claimant worked with a vocational rehabilitation agency for one to two weeks but due to pain in her hand and back could not perform the assigned task of folding a sack and tying it with rope. (R. 41-42).

Claimant has no health insurance and does not receive Medicaid, but does get $200 a month in food stamp assistance. (R. 44, 56). She sees a doctor and fills her prescriptions at Good Samaritan, a free clinic, and utilizes the charity program at the hospital, but the latter is only for a limited period of time. (R. 44). Claimant lives alone in a government-funded apartment that is on the ground floor, is handicapped accessible with no steps, and she receives $81 a month to pay the utilities. (R. 49-50, 56-57). If Claimant needs money she must borrow it but has no income or means to repay what she borrows. (R. 57).

Claimant has scoliosis and metal rods were placed in her back at age 11. (R. 42). Claimant

5

experiences pressure and pain in her upper and lower back caused by the rod coming loose and takes Tylenol for her back pain, which helps sometimes but not often. (R. 43, 61-62). When she feels the rod pop, she moves against the wall to work it back into place. (R. 43). At the time of Claimant's surgery her parents were told that because of her young age she would need another operation eventually, and later another doctor x-rayed her back and determined the top and bottom of the rod were coming apart. *Id.* Claimant experiences pain after sitting, standing, working, or doing anything for a period of time and has to quit. *Id.* For example, she can only wash a few dishes at a time and has to lean over the sink and prop herself up with her arm to take the pressure off her back. *Id.* Claimant also experiences pain and muscle spasms in her legs, for which she takes Neurontin at bedtime. (R. 49).

Claimant shakes uncontrollably, not all the time but often, and does not know the cause. (R. 44). She experiences panic attacks one to three times a week or more and cannot predict when they will occur. (R. 45). During a panic attack Claimant believes she is about to die. *Id.* Sometimes, if it is not a particularly severe attack, she can move and the feeling will go away, but most of the time she has to wait it out. (R. 46). When Claimant feels anxious or panicked she rips her fingers and scratches at her arms and legs without realizing what she is doing. *Id.* Claimant also has obsessive compulsive disorder, which causes her to think if she does not do things a certain way then someone she knows will get sick and die. (R. 47). Claimant takes Prozac for her nerves and Vistaril for anxiety. (R. 48). Claimant could not function without these medications, which are helpful but do not completely eliminate her problems. (R. 48-49).

Claimant has no family nearby and does not like to stay alone because she is fearful she will fall or something bad will happen and no one will know. (R. 55, 59). She does not actually

6

experience falls, and her doctor said it was partially mental and her medicine is supposed to help her in this regard. *Id.* Claimant can get in and out of bed without assistance but can only sleep on her left side due to pain in her neck and head. (R. 50). Claimant can dress herself using certain techniques, such as putting on her pants while seated. *Id.* She is able to shower unassisted utilizing the handicapped railings in her shower, but if not for those she would need assistance and is unable to get in and out of a bathtub. (R. 50-51). On a typical day, Claimant wakes, makes a peanut butter sandwich or cereal for breakfast, showers, then listens to the radio, watches television, or crochets sometimes. (R. 51-52, 59). She can only crochet for a few minutes at a time before experiencing pain in her arms, shoulders, and back, and she cannot watch a movie in one sitting because her "mind won't comprehend the whole movie, all the way through." (R. 62-63). Claimant cannot see to read but will look at the pictures in a book or the newspaper. (R. 60).

Claimant estimated she could sit for five to ten minutes before feeling pressure on her back and needing to move or walk before sitting again and could stand or walk for five minutes before needing to sit. (R. 51-52). When Claimant walks she has to hold onto furniture. (R. 52). She seldom uses the stove because it bothers her back and she is fearful of starting a fire and mostly eats sandwiches, cereal, chips, crackers, and the like. *Id.* Claimant does a few chores like dusting but has to take breaks, and she cannot sweep or mop because it pulls her back so a friend helps her with those chores. (R. 52, 60). She does her own laundry but reaching into the washer and dryer causes her back to pull and hurt. (R. 53). Claimant has one friend who visits once or twice a week and another who comes by to check on her most every day, but she does not visit with anyone else living in her apartment building. (R. 60-61).

Claimant has never had a driver's license, and a friend takes her to the grocery store once a

7

week. (R. 53-54). Claimant utilizes a cane and holds onto her friend's arm when walking because Claimant is afraid of falling. (R. 53). Her friend unloads the shopping basket because Claimant cannot lift heavy things, and even picking up a gallon of milk makes her back hurt. (R. 53-54). Claimant would rather not have to go shopping because it bothers her back and makes her anxious to be around others. (R. 54). Claimant started attending church two weeks prior to the hearing and is only able to do so with the assistance of her friend who helps her walk. (R. 54-55). Claimant's condition, including her ability to walk, her back, and her nerves, had worsened in two years prior to the hearing and she used to be able to walk a lot of places. (R. 55). Claimant believed she could stand on her toes for maybe a second and could not squat or bend over because of the rod in her back. *Id.* Claimant can raise her arms a little above shoulder level but experiences pain in the top of her back from the rod pulling. (R. 56).

## C.     Vocational Expert's Testimony at the Administrative Hearing

Jacqueline Kennedy-Merritt testified as a VE at the administrative hearing. (R. 64-72). After classifying Claimant's past relevant work, the ALJ asked the VE to assume a hypothetical individual of the same age, education and prior work experience as Claimant with the RFC to perform light exertional work that would accommodate the need for a low stress, low production work environment, with the performance of only simple routine, repetitive tasks, and would require only occasional exposure to people. (R. 65). The VE indicated the hypothetical individual could not perform Claimant's past relevant work, but could perform the jobs of routing clerk, Dictionary of Occupational Titles ("DOT") code 222.687-022, light in exertion, with an SVP of 2; marker, DOT code 209.587-034, light in exertion, with an SVP of 2; and final inspector, DOT code 727.687-054, light in exertion, with an SVP of 2. *Id.*

8

In response to questioning by Claimant's attorney the VE further described the identified jobs. A routing clerk is a mail clerk or sorter, and the job requires four to five hours of standing, three to four hours of sitting, the option to sit or stand while doing certain tasks, some walking to do tasks such as delivering mail, no bending or stooping according to the DOT (the VE indicated less than one third of the time), frequent reaching and handling, no fast-paced production work, and reaching above shoulder level would depend on the particular place of employment and the inability to do so might possibly preclude such work. (R. 66-68, 71). A marker is an individual who marks merchandise with tags such as a label or price, and the job can be performed sitting or standing at the employer's discretion, requires no interaction with the public, occasional interaction with supervisors or coworkers, no stooping or bending, and frequent reaching straight in front but not overhead. (R. 68-70). A final inspector inspects batteries before packaging to ensure there are no defects, and the job can be performed sitting for the most part, although standing and some walking may be required to send the batteries on in the process, requires lifting ten pounds or less, no bending or stooping, frequent reaching but not overhead, no fast-paced production work, no interaction with the public, and occasional contact with a supervisor. (R. 70-71).

## V. DISCUSSION

### A. Consideration of Borderline Age Situation

Claimant contends that the ALJ mechanically applied the age categories in a borderline situation when considering whether she was disabled under the Medical Vocational Guidelines ("Grids") in violation of 20 C.F.R. § 416.963(b). Pl.'s Mem. [DE-15] at 10-15. Defendant in response asserts that even assuming Claimant fell into a borderline age situation, she has failed to make a showing that justifies using a higher age category. Def.'s Mem. [DE-17] at 8-11. The

9

undersigned concludes that Claimant's case presents a borderline age situation requiring remand for the ALJ to consider in the first instance whether to use the older age category where it is not apparent that he did so as required by 20 C.F.R. § 416.963(b).

A claimant's age is a vocational factor in the disability determination. 20 C.F.R. § 416.963(a). Individuals are classified into one of three age categories: a "younger person" is under the age of 50; a "person closely approaching advanced age" is age 50–54; and a "person of advanced age" is age 55 or older. *Id.* § 416.963(c)-(e). For a "younger person" age is generally not considered to "seriously affect [the] ability to adjust to other work." *Id.* § 416.963(c). However, for a "person closely approaching advanced age," the claimant's age along with a "severe impairment(s) and limited work experience may seriously affect [the] ability to adjust to other work." *Id.* § 416.963(d). At "advanced age," the age factor is considered to "significantly affect[] a person's ability to adjust to other work. *Id.* § 416.963(e). Therefore, "advancing age" is an "increasingly limiting factor" in the ability to adjust to other work. *Id.* § 416.963(a).

The SSA uses each age category that applies during the disability determination period, which here extends through the date of decision. *Id.* § 416.963(b); *see Mitchell v. Astrue*, No. 3:10-CV-544-RJC-DSC, 2011 WL 5037134, at *2 (W.D.N.C. Oct. 24, 2011) (unpublished) ("The ALJ must look to the Claimant's age from the time she alleges she was disabled until the date the ALJ announces his decision.") (citing 20 C.F.R. § 416.963(b)). In a "borderline situation," where the claimant is "within a few days to a few months of reaching an older age category, and using the older age category would result in a determination or decision that [the claimant is] disabled," the regulations provide that the age categories will not be mechanically applied and the SSA will "consider whether to use the older age category after evaluating the overall impact of all the factors

of [the claimant's] case." 20 C.F.R. § 416.963(b). The ALJ is not required to automatically apply the older age category, *id.*, but rather must "find additional vocational adversities in RFC, education, or work experience (beyond those already considered in the rules) to support a determination to use the next higher age." Program Operations Manual System ("POMS") § DI 25015.005(D)(1), https://secure.ssa.gov/apps10/poms.NSF/lnx/0425015005.

Here, Claimant's birth date is December 29, 1958. (R. 28). On the date Claimant filed her application, May 12, 2011, she was 52 years old, and on the date of the ALJ's decision, August 29, 2013, Claimant was 54 years old. (R. 15, 28). Thus, at all times during the disability period Claimant was a "person closely approaching advanced age" and the ALJ classified her as such. 20 C.F.R. § 416.963(d); (R. 28). However, Claimant was only four months short of attaining age 55 on the date of decision, which she contends presents a "borderline situation" requiring the ALJ to consider using the older age category for a "person of advanced age." Pl.'s Mem. [DE-15] at 12. Claimant asserts, and Defendant does not appear to contest, that had the ALJ determined Claimant was a "person of advanced age," a finding of disabled would have been directed pursuant to Grid Rule 202.01. *Id.*; Def.'s Mem. [DE-17] at 8-11.

The court must first determine whether a claimant within four months of reaching an older age category presents a "borderline situation." The regulation does not prescribe a hard and fast rule but rather defines the period as "within a few days to a few months." 20 C.F.R. § 416.963(b). However, case law within the Fourth Circuit suggests that four months from an older age category is a borderline situation. *Compare Brown v. Colvin*, No. 3:13-CV-00393-FDW, 2014 WL 1658751, at *4 (W.D.N.C. Apr. 25, 2014) (unpublished) (remanding case due to ALJ's failure to consider applying older age category where claimant was five months and nine days from moving into the

next category at the time of the decision) (citing *Amick v. Colvin*, No. 5:12-0922, 2013 WL 4046349, at *4 (S.D. W.Va. Aug. 8, 2013) (unpublished) ("Claimants are in borderline situations when they are about six months from an older age category."); *France v. Apfel*, F. Supp. 2d 484 (D.Md. 2000) (granting plaintiff's motion for summary judgment where the ALJ failed to sufficiently address the borderline age situation and strictly applied an age category to plaintiff, who was five months shy of a higher age category)), *with McGinnis v. Colvin*, No. 1:12-CV-00219-MOC, 2013 WL 3353836, at *3 (W.D.N.C. July 3, 2013) (unpublished) (concluding the ALJ did not err in declining to apply the older age category where the claimant was eight months from turning 55); *Dunn v. Astrue*, No. 7:11-CV-132-FL, 2012 WL 7748800, at *8 (E.D.N.C. Aug. 9, 2012) (unpublished) (concluding there was no borderline situation presented where the plaintiff turned 55 almost seven months after the ALJ's decision) (citing *Paschall v. Astrue*, 2011 WL 1750757, *11 (E.D.N.C. May 6, 2011) (finding that claimant's birthday nine months after the date of the ALJ's decision did not present a borderline age situation)), *report and recommendation adopted sub nom. Dunn v. Colvin*, 2013 WL 1091075 (E.D.N.C. Mar. 15, 2013). Defendant does not seriously challenge Claimant's assertion that her case presents a borderline situation and has cited no case law to the contrary, although in a footnote Defendant takes issue with the determination in *France* that five months presented a borderline situation, suggesting that five months is stretching the word "few" to its limits. Def.'s Mem. [DE-17] at 10 n.4. The time period at issue here is four months, not five, and given the lack of authority cited by Defendant and the weight of case law within the Fourth Circuit, the undersigned concludes that Claimant's case presentes a borderline situation.

Defendant next argues that even assuming a borderline situation, Claimant must show that she has additional vocational adversities justifying use of the higher age category and that she has

12

failed to make the requisite showing. *Id.* at 10-11. The text of the regulation is plain that where a borderline situation is presented and applying the older age category will result in a finding of disabled under the Grids, the SSA *"will consider* whether to use the older age category after evaluating the overall impact of all the factors of your case." 20 C.F.R. § 416.963(b) (emphasis added). Defendant invites the court to apply the SSA's own internal guidelines found in the Hearings, Appeals and Litigation Law Manual ("HALLEX")[2] and conclude that Claimant has not satisfied the requirements for application of a higher age category. However, the Fourth Circuit has recently cautioned, albeit in a different context, that "precedent makes clear that it is not our role to speculate as to how the ALJ applied the law to its findings or to hypothesize the ALJ's justifications that would perhaps find support in the record." *Fox v. Colvin*, No. 14-2237, 2015 WL 9204287, at *5 (4th Cir. Dec. 17, 2015) (unpublished) (per curiam); *see also Mitchell*, 2011 WL 5037134, at *3 (rejecting the Commissioner's argument that in a borderline situation a claimant must show the ALJ would have decided the case differently, because "[t]he Fourth Circuit regularly remands without such a showing of prejudice where the agency fails to abide by procedures required by its duly promulgated regulations."). At step five the ALJ noted that Claimant was 52 years old on the date of application, and there is no evidence the ALJ recognized that Claimant's case presented a borderline situation as of the date of decision. *See Mitchell*, 2011 WL 5037134, at *2 (concluding that where the ALJ at step five cited Claimant's age on the alleged onset date, when she was five years from the next age category, the ALJ may not have noticed that she was in the borderline range at the time of decision or may not known he was to consider her age at the time of decision).

---

[2] The HALLEX is a "manual in which the 'Associate Commissioner of Hearings and Appeals conveys guiding principles, procedural guidance and information to the office of Hearings and Appeals (OHA) staff.'" *Melvin v. Astrue*, 602 F. Supp. 2d 694, 699 (E.D.N.C. 2009) (quoting HALLEX I-1-0-1).

Accordingly, where it is unclear whether the ALJ considered applying the older age category as required by 20 C.F.R. § 416.963(b), the case should be remanded to the Commissioner to make the determination in the first instance.

## B. The ALJ's Credibility and RFC Determinations

Claimant contends the ALJ did not provide a function-by-function assessment of the non-exertional mental functions associated with Claimant's anxiety disorder and failed to provide sufficient reasons supported by substantial evidence for discounting Claimant's credibility. Pl.'s Mem. [DE-15] at 15-27. Defendant contends the ALJ's RFC and credibility determinations are supported by substantial evidence. Def.'s Mem. [DE-17] at 12-23.

An individual's RFC is the capacity an individual possesses despite the limitations caused by physical or mental impairments. 20 C.F.R. § 416.945(a)(1); S.S.R. 96-8p, 1996 WL 374184, at *1 (July 2, 1996). "[T]he residual functional capacity 'assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions' listed in the regulations." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting S.S.R. 96-8p). The RFC is based on all relevant medical and other evidence in the record and may include a claimant's own description of limitations arising from alleged symptoms. 20 C.F.R. § 416.945(a)(3); S.S.R. 96-8p, 1996 WL 374184, at *5. Where a claimant has numerous impairments, including non-severe impairments, the ALJ must consider their cumulative effect in making a disability determination. 42 U.S.C. § 423(d)(2)(B); *see Hines v. Bowen*, 872 F.2d 56, 59 (4th Cir. 1989) ("[I]n determining whether an individual's impairments are of sufficient severity to prohibit basic work related activities, an ALJ must consider the combined effect of a claimant's impairments.") (citations omitted). Furthermore, in assessing functional

14

limitations, the ALJ must consider "all relevant evidence to obtain a longitudinal picture of [the claimant's] overall degree of functional limitation." 20 C.F.R. § 416.920a(c)(1). The ALJ has sufficiently considered the combined effects of a claimant's impairments when each is separately discussed by the ALJ and the ALJ also discusses a claimant's complaints and activities. *Baldwin v. Barnhart*, 444 F. Supp. 2d 457, 465 (E.D.N.C. 2005) (citations omitted). The RFC assessment "must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." S.S.R. 96-8p, 1996 WL 374184, at *7.

The RFC is utilized by the ALJ at steps four and five to determine whether the claimant can perform past work and, if not, whether there is other work the claimant can perform. *See Mascio*, 780 F.3d at 636 (citing S.S.R. 96-8p, 1996 WL 374184, at *3-4). Thus, a proper RFC is critical, and "[w]ithout a careful consideration of an individual's functional capacities to support [a residual functional capacity] assessment based on an exertional category, the adjudicator may either overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do, or find that the individual has limitations or restrictions that he or she does not actually have." *Id.* (quoting S.S.R. 96-8p, 1996 WL 374184, at *4).

When assessing a claimant's RFC, it is within the province of the ALJ to determine a claimant's credibility. *See Shively v. Heckler*, 739 F.2d 987, 989-90 (4th Cir. 1984) ("Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight.") (citation omitted). Federal regulation 20 C.F.R. § 416.929(a) provides the authoritative standard for the evaluation of subjective complaints of pain and symptomology, whereby "the determination of whether a person

15

is disabled by pain or other symptoms is a two-step process." *Craig*, 76 F.3d at 593-94. First, the ALJ must objectively determine whether the claimant has medically documented impairments that could cause his or her alleged symptoms. S.S.R. 96-7p, 1996 WL 374186, at \*2 (July 2, 1996); *Hines v. Barnhart*, 453 F.3d 559, 564 (4th Cir. 2006). If the ALJ makes this first determination, he must then evaluate "the intensity and persistence of the claimant's pain[,] and the extent to which it affects her ability to work," *Craig*, 76 F.3d at 595, and whether the claimant's statements are supported by the objective medical record. S.S.R. 96-7p, 1996 WL 374186, at \*2; *Hines*, 453 F.3d at 564-65. Objective medical evidence may not capture the full extent of a claimant's symptoms, so where the objective medical evidence and subjective complaints are at odds, the ALJ should consider all factors "concerning the individual's functional limitations and restrictions due to pain and other symptoms." S.S.R. 96-7p, 1996 WL 374186, at \*3 (showing the complete list of factors). The ALJ may not discredit a claimant solely because his or her subjective complaints are not supported by objective medical evidence. *See Craig*, 76 F.3d at 595-96. But neither is the ALJ required to accept the claimant's statements at face value; rather, the ALJ "must make a finding on the credibility of the individual's statements based on a consideration of the entire case record." S.S.R. 96-7p, 1996 WL 374186, at \*2; *see also Taylor v. Astrue*, No. 5:10-CV-263-FL, 2011 WL 1599679, at \*4-8 (E.D.N.C. Mar. 23, 2011) (unpublished) (finding the ALJ properly considered the entire case record to determine that claimant's subjective complaints of pain were not entirely credible), *adopted by* 2011 WL 1599667 (E.D.N.C. Apr. 26, 2011).

## 1. The RFC Determination

Claimant contends the ALJ did not provide a function-by-function assessment of the non-exertional mental functions associated with Claimant's anxiety disorder and failed to sufficiently

16

account for Claimant's moderate limitations in activities of daily living, social functioning, and concentration, persistence, and pace in the RFC. Pl.'s Mem. [DE-15] at 15-21. Defendant contends the ALJ's RFC determination is supported by substantial evidence. Def.'s Mem. [DE-17] at 12-19.

The ALJ found claimant had the severe mental impairment of anxiety disorder and applying the special technique determined that Claimant's anxiety disorder resulted in moderate restrictions in her activities of daily living, social functioning, and concentration, persistence and pace. (R. 18-19). However, as the ALJ acknowledged, this is not a substitute for the RFC assessment, which requires a "more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impairments (SSR 96-8p)." (R. 20). "Work-related mental activities generally required by competitive, remunerative work include the abilities to: understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting." S.S.R. 96-8p, 1996 WL 374184, at *6. The ALJ determined Claimant was capable of light exertion work with the further limitations of a low stress, low production work environment with performance of only simple, routine, and repetitive tasks with only occasional exposure to people. (R. 20).

In considering Claimant's anxiety in the RFC determination, the ALJ provided the following analysis:

> As for her alleged mental impairments, the evidence does not indicate she has received consistent mental health treatment nor has she had any inpatient psychiatric hospitalizations or presented to the emergency room with reports of anxiety or panic attacks. Further, despite her testimony, there is evidence that she has not always taken her medications as prescribed. (Exhibit 6F). Specifically, in October 2011, she reported she was not taking her medication. (Exhibit 10F, p.4). She was referred to Lifeworks for psychiatric treatment and was assessed with a panic disorder with

17

compulsive behaviors. (Exhibit 10F, p.13). The treatment notes document monthly treatment through January 2012. Thereafter, she treated on three other occasions in 2012 and two occasions in 2013.

Additionally, the treatment notes do not include objective findings that support the extent of the claimant's alleged impairments. In November 2011, she reported compulsive behaviors like washing her hands obsessively, compulsively turning off lights, and compulsive fears, including a fear of heights. (Exhibit 10F). Upon examination, it was noted she was alert and attentive, coherent and logical, and she did not have any hallucinations, delusions, or suicidal ideation. (Exhibit 10F, p.13). In January 2012, the claimant did report some improvement in her OCD symptoms. (Exhibit 10F, p.9). She specifically reported she had reduced the amount of times she washed her hands. Upon examination in May 2012, it was noted she was anxious, but "not apparently depressed." (Exhibit 16F, p.5). She also reported she was doing better in October 2012 and it was noted she was cheerful and talkative. (Exhibit 16F, p.4).

The undersigned acknowledges she reported increased symptoms in May and June 2013. However, although she reported having increased panic attacks, the evidence indicates she had not received any treatment from October 2012 to May 2013. (Exhibit 16F). Otherwise, the evidence indicates she presented to an outpatient clinic in May 2013 reporting multiple issues, including depression and anxiety issues with some obsessive components. It was noted she was "a little bit anxious," but was otherwise alert, oriented, and pleasant. She was told to continue her current regimen, which indicates that her provider did not feel any increase in medication was warranted. (Exhibit 17F, p.11).

(R. 24). The ALJ also considered and weighed the opinions of the consulting examiner and the state

agency psychological consultants:

The undersigned has also considered the findings from her September 2011 psychological consultative examination. (Exhibit 6F). Upon examination, she exhibited "good reality contact" and was alert and responsive. It was noted that she was "jittery, in pain and discomfort, and fearful throughout much of the evaluation." (Exhibit 6F, p.3). Her emotional expression was described as appropriate to thought content and situation; she denied suicidal or homicidal thoughts; and had no delusions or bizarre suspicions. (Exhibit 6F, p.4). She was well oriented to time, place, person, and situation. She could recall six digits forward and four digits backward as well as four of five common objects after five minutes. She could describe what she did the day before and reported playing games on the computer and going shopping at a department store and the grocery store. She identified four recent Presidents and names five large cities in the United States. She also counted by serial

18

3s and was capable of performing simple calculations. (Exhibit 6F, p.4). John H. Bevis, M.A., assessed the claimant with generalized anxiety disorder, panic disorder without agoraphobia, history of depression, and obsessive-compulsive disorder, with a GAF of 46. (Exhibit 6F, p.5). He opined she could understand and follow simple directions; maintain fair attention and concentration when performing simple repetitive tasks; but will likely experience difficulties relating to fellow workers and supervisors due to her multiple medical problems and would likely experience considerable difficulties tolerating stressors, pressures, and physical demands associated with full-time work. (Exhibit 6F, p.5).

. . . .

[T]he undersigned has also given little weight to Mr. Bevis's opinions following the psychological consultative examination for several reasons. Initially, he had the opportunity to meet with the claimant on only one occasion for a short period of time. Additionally, at the time that he treated with the claimant, she had not yet begun receiving mental health treatment, so he did not have the opportunity to review more recent records. As discussed above, the records from 2012 documented improvement in her reported obsessive compulsive behaviors. She did not report any significant worsening in her condition thereafter until the two appointments following the disability hearing in conjunction with these proceedings. Accordingly, the evidence of record as a whole does not indicate she is as limited as found by Mr. Bevis. Further, he based some of his conclusions on the claimant's reported physical symptoms and condition, which is outside his realm of expertise. Therefore, his opinions have been given little weight.

. . . .

The State agency psychological consultants found the claimant has no more than moderate limitations. (Exhibits 1A; 4A). Despite the limitations, they found the claimant is capable of performing simple, routine, and repetitive tasks in a low-stress setting with minimal social demands. (Exhibits 1A; 4A). The undersigned has given the consultants' opinions great weight in making this finding, as they are consistent with the evidence of record as a whole. Specifically, the claimant has received minimal, conservative treatment for her alleged mental impairments and in 2012, she primarily reported improvement in her symptoms. There have also been gaps in her treatment and the records do not document significant objective findings. Further, although the claimant has reported having multiple panic attacks, there is no evidence she has sought any emergency treatment due to any panic attacks nor has her medication been significantly adjusted due to her reports of increased panic attacks. This indicates that perhaps her panic attacks are not as significant as alleged.

(R. 24-25, 27). The ALJ thoroughly discussed the evidence of record, including the medical records,

19

opinion evidence, and Claimant's testimony with respect to her mental impairments and "has provided the court with a sufficiently drafted decision to review for substantial evidence." *Hitchcock v. Colvin*, No. 4:14-CV-154-FL, 2015 WL 5725672, at *4 (E.D.N.C. Sept. 30, 2015) (unpublished). This distinguishes the instant case from *Mascio*, where the court found the ALJ's RFC determination was "sorely lacking in the analysis needed" to conduct a meaningful review of the ALJ's conclusions. 780 F.3d at 636.

With respect to the specific areas for which the ALJ found Claimant to have moderate difficulties, these were appropriately addressed by the RFC or the ALJ explained the reason no limitation was necessary. First, Claimant contends the ALJ did not account for her moderate limitations in activities of daily living in the RFC. Pl.'s Mem. [DE-15] at 18. "Activities of daily living include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(C)(1). Although the ALJ found moderate limitations in activities of daily living, the ALJ concluded that Claimant's limitations in this regard were largely due to her physical impairments, which were addressed through the limitation to light exertion work. (R. 18-19). The ALJ also expressly considered Claimant's activities of daily living in formulating the RFC. (R. 21). Claimant testified that she requires some assistance with cleaning and shopping but can do light chores, she lives alone, cares for her personal grooming, prepares simple meals for herself, and there is no evidence she cannot handle her own personal finances. (R. 21-22). Accordingly, the ALJ sufficiently addressed Claimant's moderate difficulties in activities of daily living in the RFC.

Next, Claimant contends the ALJ did not fully address her moderate limitations in social

functioning because he failed to define "exposure" or address how Claimant would interact with the

public, supervisors, or co-workers. Pl.'s Mem. [DE-15] at 18-19.

> Social functioning refers to your capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals. Social functioning includes the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers. You may demonstrate impaired social functioning by, for example, a history of altercations, evictions, firings, fear of strangers, avoidance of interpersonal relationships, or social isolation. You may exhibit strength in social functioning by such things as your ability to initiate social contacts with others, communicate clearly with others, or interact and actively participate in group activities.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(C)(2). To account for Claimant's moderate limitation

in social functioning the ALJ limited Claimant to only occasional exposure to people. (R. 20). The

VE reasonably understood the term "exposure" to mean contact or interaction with and testified

specifically that the job of marker requires no interaction with the public and occasional interaction

with supervisors or coworkers and the job of final inspector requires no interaction with the public

and occasional contact with a supervisor. (R. 69, 72). Moreover, there is no evidence in the record

that Claimant had difficulty getting along with others, such as her friends that come to help her shop,

clean, and take her to church. The ALJ also appropriately relied on the opinions of the state agency

psychological consultants who concluded that despite Claimant's mental limitations she retains the

ability to work in a setting with minimal social demands. (R. 27, 84, 101). Accordingly, the ALJ's

limitation in the RFC of occasional exposure to people adequately accounted for Claimant's

moderate limitation in social functioning.

Next, Claimant contends that a limitation to simple, routine, repetitive tasks does not account

for her moderate difficulties with concentration, persistence, and pace. Pl.'s Mem. [DE-15] at 19-20.

In *Mascio*, the Fourth Circuit held that "an ALJ does not account 'for a claimant's limitations in

21

concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work.'" 780 F.3d at 638 (quoting *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011) (joining the Third, Seventh, and Eighth Circuits)). The court explained that "the ability to perform simple tasks differs from the ability to stay on task" and that "[o]nly the latter limitation would account for a claimant's limitation in concentration, persistence, or pace." *Id.* The court also indicated that there could be instances where a limitation in concentration, persistence, and pace does not affect the Claimant's ability to work and would be appropriately excluded from the hypothetical to the VE and the RFC. *Id.* In such circumstances, however, an explanation from the ALJ is required. *Id.*

Here, the ALJ noted that a consultative examiner determined Claimant "maintained fair attention and concentration when performing simple repetitive tasks" (R. 25, 403) and limited Claimant accordingly. Thus, in this case, it is evident from the ALJ's decision that the limitation to simple, routine, and repetitive tasks adequately addressed Claimant's ability to stay on task, distinguishing this case from *Mascio*. *See Belton v. Colvin*, No. 1:14CV777, 2015 WL 5023087, at *7 (M.D.N.C. Aug. 24, 2015) (unpublished) (distinguishing *Mascio* where consultative examiner opined that "although Plaintiff struggled with maintaining concentration, persistence, and pace, she was not precluded from understanding, retaining, and following instructions and not precluded from performing simple, routine, repetitive tasks"), *report and recommendation adopted by* 2015 WL 5712732 (M.D.N.C. Sept. 29, 2015). The ALJ also limited Claimant to a low stress, low production work environment with only occasional exposure to people. (R. 20, 65); *see Belton*, 2015 WL 5023087, at *8 (additional limitations of "need to avoid production work or similar fast-paced jobs with deadlines and quotas . . . directly accounted for problems in stress, attention, and task

22

persistence."). Limitations such as these have been found to adequately address moderate limitations in concentration, persistence, and pace. *See Russo v. Astrue*, 421 F. App'x 184, 192 (3d Cir. Apr. 6, 2011) (unpublished) (finding hypothetical including the limitations of "understand, remember, and carry out simple instructions, would have limited contact with the public and coworkers, and would not have a quota to fulfill" accounted for moderate difficulties with concentration, persistence, and pace); *Seamon v. Astrue*, 364 F. App'x 243, 248 (7th Cir. Jan. 29, 2010) (unpublished) ("[T]he ALJ captured [claimant's] moderate limitation in concentration, persistence, and pace when he included a restriction of 'no high production goals.'"); *Weeks v. Colvin*, No. 5:14-CV-155-D, 2015 WL 5242927, at *2 (E.D.N.C. Sept. 8, 2015) (unpublished) (finding limitation "to performing simple, routine, repetitive tasks with only occasional contact with the general public in an environment with few workplace changes" sufficiently accounted for difficulties with concentration and persistence but not pace); *Ford v. Colvin*, No. 4:14-CV-79-D, 2015 WL 5008962, at *3 (E.D.N.C. Aug. 19, 2015) (unpublished) (distinguishing *Mascio* where the ALJ accounted for claimant's moderate limitation in pace through a limitation to a "low production occupation" and in persistence through a limitation of "no constant change"); *Linares v. Colvin*, No. 5:14-CV-00120, 2015 WL 4389533, at *4 (W.D.N.C. July 17, 2015) (unpublished) (distinguishing *Mascio* where the ALJ limited claimant to "simple, repetitive, routine tasks in a stable work environment at a nonproduction pace with only occasional public contact," accounting for limitation in concentration and persistence by restricting her to a stable work environment with only occasional public contact and in pace by restricting her to nonproduction pace). *But see Jones v. Colvin*, No. 4:14-CV-00200-RN, 2015 WL 4773542, at *6 (E.D.N.C. Aug. 13, 2015) (unpublished) (concluding, prior to the decisions in *Weeks* and *Ford*, that limitation "to simple, routine, repetitive tasks; should work in a

23

low production occupation, one which would require no complex decision making, constant change or dealing with crisis situations" did not adequately address moderate limitation in concentration, persistence, and pace). Accordingly, the ALJ properly accounted for Claimant's moderate difficulties in maintaining concentration, persistence, and pace in the RFC.

Claimant also contends the ALJ erred by failing to explain what "low stress" means in the context of Claimant's particular impairments in violation of S.S.R. 85-15. Pl.'s Mem. [DE-15] at 20. The Ruling provides the following guidance with respect to mental impairment and the stress of work:

> The reaction to the demands of work (stress) is highly individualized, and mental illness is characterized by adverse responses to seemingly trivial circumstances. The mentally impaired may cease to function effectively when facing such demands as getting to work regularly, having their performance supervised, and remaining in the workplace for a full day. A person may become panicked and develop palpitations, shortness of breath, or feel faint while riding in an elevator; another may experience terror and begin to hallucinate when approached by a stranger asking a question. Thus, the mentally impaired may have difficulty meeting the requirements of even so-called "low-stress" jobs.

S.S.R. 85-15, 1985 WL 56857, at \*6 (Jan. 1, 1985). As an initial matter, "Ruling 85-15 applies only when a claimant suffers exclusively from non-exertional limitations," *Epperson v. Astrue*, No. 2:11-CV-12-D, 2012 WL 3862717, at \*4 (E.D.N.C. Sept. 5, 2012) (unpublished) (citing *Roma v. Astrue*, 468 F. App'x 16, 20 (2d Cir. 2012) (per curiam) (unpublished)). Claimant has both exertional and non-exertional limitations and, thus, Ruling 85-15 does not apply. (R. 17). Notwithstanding the Ruling's inapplicability, in addition to limiting Claimant to a low stress environment, the ALJ also limited Claimant's contact with people, which the consultative examiner cited in his findings as a likely source of difficulty. (R. 403); *see Epperson*, 2012 WL 3862717, at \*4 (rejecting argument that limitation to "low stress work" was impermissibly vague where the ALJ

24

also limited claimant to occasional interaction with others based on physicians' opinions about the claimant's likely reactions to work-related stress). Accordingly, the ALJ's limitation to a low stress environment was not impermissibly vague.

In sum, the ALJ's RFC analysis allows the court to conduct a meaningful review of the ALJ's conclusions and the ALJ sufficiently accounted for Claimant's moderate limitations in activities of daily living, social functioning, and concentration, persistence, and pace in the RFC.

## 2. The ALJ's Credibility Determination

Claimant contends the ALJ failed to provide sufficient reasons supported by substantial evidence for discounting Claimant's credibility. Pl.'s Mem. [DE-15] at 21-27. Defendant contends the ALJ's credibility determination is supported by substantial evidence. Def.'s Mem. [DE-17] at 19-23.

In formulating Claimant's RFC, the ALJ considered Claimant's testimony at the administrative hearing and determined Claimant's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." (R. 22). Claimant contends the use of this language violated the Fourth Circuit's decision in *Mascio* with respect to the use of boilerplate language in assessing a claimant's credibility. Pl.'s Mem. [DE-15] at 21-22. In *Mascio*, it was the ALJ's finding that the claimant's statements were not entirely credible "to the extent they are inconsistent with the above residual functional capacity assessment" that the court found problematic. 780 F.3d at 639. The Fourth Circuit explained that the boilerplate language "'gets things backwards' by implying 'that ability to work is determined first and is then used to determine the claimant's credibility.'" *Id.*

25

(quoting *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012)). Here, the ALJ did not violate *Mascio* and S.S.R. 96-8p by comparing Claimant's alleged pain with the RFC, but rather considered Claimant's credibility regarding her limitations as part of the RFC analysis. Accordingly, the language used by the ALJ does not in and of itself amount to error.

Claimant also contends that the ALJ's stated reasons for discounting Claimant's credibility lack merit. Pl.'s Mem. [DE-15] at 22-27. Claimant specifically takes issue with the following reasons given by the ALJ for discounting Claimant's credibility: (1) "despite limited resources to obtain medical care the ALJ did not believe [Claimant] had exhausted all resources available" (R. 22); (2) "[Claimant] has taken only conservative medication for her pain and has not received treatment from a specialist or been to the emergency room enough" (R. 22-23); (3) "Dr. Johanson said [Claimant's] scoliosis was stable" (R. 23); (4) "objective evidence did not support [Claimant's] testimony of having difficulties reaching overhead" *id.*; and (5) "[Claimant] had a poor work history" (R. 25).

With respect to the ALJ's first and second findings, that Claimant has not exhausted all resources available and has utilized conservative measures without treatment from specialists or emergency room visits, those observations were in the context of making the larger point that there is no evidence Claimant has required more care than she currently receives through the free clinic. (R. 22-23). Claimant testified that she is eligible for a charity program at the hospital (R. 44), but the ALJ noted that "[w]hile [Claimant] has presented to the emergency room on occasion, it was primarily for reasons unrelated to the impairments that allegedly cause her disability" and "[o]therwise, she has treated at a local clinic, and even those treatment notes do not document objective findings that would preclude her from performing all work." (R. 22); *see Dunn v. Colvin*,

26

607 F. App'x 264, 273 (4th Cir. June 1, 2015) (unpublished) ("[T]his Court has long held that it is appropriate for the ALJ to consider the conservative nature of a plaintiff's treatment—among other factors—in judging the credibility of the plaintiff."); *Mickles v. Shalala*, 29 F.3d 918, 930 (4th Cir. 1994) ("an unexplained inconsistency between the claimant's characterization of the severity of her condition and the treatment she sought to alleviate that condition is highly probative of the claimant's credibility"). Accordingly, there is nothing improper about the ALJ's consideration of Claimant's conservative treatment where there is no evidence that she required additional treatment but was unable to afford it.

With respect to the ALJ's reference to Dr. Johanson's description of Claimant's scoliosis as "stable" (R. 23, 500), this was but one of several pieces of evidence the ALJ considered in the credibility determination. In noting that Claimant's scoliosis was characterized as "stable," the ALJ also observed that treatment notes document minimal objective findings and an orthopedic examination revealed only "mild to moderately severe" chronic osteoarthritis. (R. 23; 495-506). The ALJ also observed that "treatment notes indicate only intermittent reports of pain for which [Claimant] has primarily taken Tylenol and Neurontin, which indicates fairly conservative treatment for her alleged pain." (R. 22). This court has previously recognized that a condition may be both "stable" and disabling. *See Sanders v. Colvin*, No. 5:13-CV-790-D, 2015 WL 736088, at *9 (E.D.N.C. Feb. 20, 2015) (unpublished) ("a finding of stability does not indicate that a function or condition is good, but instead merely that its status—whatever it might be—is unchanged from some prior time."). However, in this case, given the additional reasons provided by the ALJ in support of her assessment of Claimant's credibility regarding her back pain, the ALJ's observation that Claimant's scoliosis was stable does not undermine the ALJ's credibility analysis.

27

With respect to Claimant's testimony that she has difficulty with overhead reaching, the ALJ found "no evidence that [Claimant] has been assessed with any upper extremity impairment" and "no evidence that [Claimant] reported similar symptoms or pain in overhead reaching to any treating provider." (R. 23). While Claimant asserts that the consultative examiner's finding that Claimant was unable to raise her arms overhead and had reduced ranges of motion in her shoulder (R. 394, 397) contradicts the ALJ's finding, the ALJ is expressly referring to Claimant's reports to and diagnoses from her treatment providers. (R. 23). The ALJ was aware of the consultative examiner's findings cited by Claimant and recounted them in the decision, *id.*, and it was appropriate for the ALJ to consider the absence of such complaints to Claimant's treatment providers. Furthermore, the ALJ's findings in this regard were limited to her discussion of Claimant's credibility with respect to overhead reaching, and the VE testified that the jobs of marker and final inspector required no overhead reaching. (R. 69-71). The ALJ gave other reasons for discounting Claimant's credibility with respect to her other limitations. Accordingly, there is no error in the ALJ's analysis regarding Claimant's credibility with respect to overhead reaching, and alternatively any error is harmless.

Finally, Claimant takes issue with the ALJ's finding that Claimant's credibility was diminished because she "has a poor work history" because she was a "homemaker for close to thirty years." (R. 25). While Claimant interprets the ALJ's analysis here as implying that the ALJ did not appreciate the demands of running a household or raising children, Pl.'s Mem. [DE-15] at 27, an alternative interpretation of the ALJ's findings in this regard is that if Claimant could engage in the demanding work of running a household and raising children, her lack of employment was not due to her alleged disability. *See Nash v. Colvin*, No. 14-V-3059-FVS, 2015 WL 3935265, at \*5 (E.D. Wash. June 26, 2015) (unpublished) (finding no error in the ALJ's credibility analysis, which

28

included an inference by the ALJ that claimant's occupation as homemaker suggested she was choosing to stay home to raise her children rather than due to an inability to work, because "where evidence is susceptible to more than one rational interpretation, it is the [Commissioner's] conclusion that must be upheld.") (quoting *Burch v. Barnhart,* 400 F.3d 676, 679 (9th Cir. 2005)). The ALJ also noted Claimant's limited earnings of $3,788.55 and $118.92 in the years she returned to work but before she alleged disability. (R. 25). Furthermore, in addition to this finding regarding Claimant's work history, the ALJ engaged in an extensive analysis of each of Claimant's alleged limitations in light of the medical records, opinion evidence, and Claimant's testimony, which provides additional substantial evidence in support of the ALJ's credibility determination. (R. 23-25).

## VI. CONCLUSION

For the reasons stated above, it is RECOMMENDED that Claimant's Motion for Judgment on the Pleadings [DE-14] be ALLOWED, Defendant's Motion for Judgment on the Pleadings [DE-16] be DENIED, and the case be remanded for further proceedings.

IT IS DIRECTED that a copy of this Memorandum and Recommendation be served on each of the parties or, if represented, their counsel. Each party shall have until **February 9, 2016** to file written objections to the Memorandum and Recommendation. The presiding district judge must conduct his or her own review (that is, make a de novo determination) of those portions of the Memorandum and Recommendation to which objection is properly made and may accept, reject, or modify the determinations in the Memorandum and Recommendation; receive further evidence; or return the matter to the magistrate judge with instructions. *See, e.g.*, 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3); Local Civ. R. 1.1 (permitting modification of deadlines specified in local rules),

72.4(b), E.D.N.C. Any response to objections shall be filed within **14 days** of the filing of the objections.

**If a party does not file written objections to the Memorandum and Recommendation by the foregoing deadline, the party will be giving up the right to review of the Memorandum and Recommendation by the presiding district judge as described above, and the presiding district judge may enter an order or judgment based on the Memorandum and Recommendation without such review. In addition, the party's failure to file written objections by the foregoing deadline will bar the party from appealing to the Court of Appeals from an order or judgment of the presiding district judge based on the Memorandum and Recommendation.** *See Wright v. Collins*, **766 F.2d 841, 846-47 (4th Cir. 1985).**

Submitted, this the 26th day of January 2016.

Robert B. Jones, Jr.
United States Magistrate Judge